**UNITED STATES, Appellee,**

v.

**Richard G. KAYNE, Defendant—Appellant.**

**UNITED STATES, Appellee,**

v.

**Edward B. KALP, Defendant—Appellant.**

**Nos. 94–1406, 94–1407.**

United States Court of Appeals, First Circuit.

Heard Dec. 5, 1995.

Decided July 24, 1996.

Francis J. DiMento, with whom DiMento & Sullivan, Boston, MA, was on brief for appellant Richard G. Kayne; John L. Roberts, Springfield, MA, by Appointment of the Court, for appellant Edward B. Kalp.

Mark J. Balthazard, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief for appellee.

Before TORRUELLA, Chief Judge, CYR, Circuit Judge, and SKINNER,* Senior District Judge.

TORRUELLA, Chief Judge.

Defendants-appellants Edward Kalp and Richard Kayne were charged with twenty-nine counts of mail fraud, in violation of 18 U.S.C. § 1341. After a six week trial, a jury convicted both defendants on fifteen counts and acquitted them on four; the judge granted a motion for acquittal on one; and the government dropped the remaining counts. The defendants were sentenced to 36–months imprisonment, and ordered to pay $339,466 in restitution. On appeal, Kayne and Kalp argue (1) that jeopardy had attached in a prior government proceeding; (2) that certain evidence was improperly admitted; (3) that the evidence submitted below was not

sufficient to sustain the convictions; and (4) that Kalp received ineffective assistance of counsel at trial. For the reasons laid out below, we affirm.

## I.  BACKGROUND

In the late 1970s, many new investors entered the market for rare coins. Unlike knowledgeable hobbyists and "vest pocket" dealers, these newcomers had no specialized expertise, and were just looking for a stable investment. Seeking to capitalize on this booming market, defendants Edward Kalp and Richard Kayne left a distinguished Boston coin brokerage and established the Rare Coin Galleries of America ("RCGA") in July 1982. Kalp, the President of RCGA, functioned as the in-house numismatist, examining and valuing coins for purchase from wholesalers, and pricing them for resale. Kayne, as RCGA's marketing director, recruited financial planners and solicited customers. For four years RCGA operated successfully, generating millions of dollars in revenues from approximately 3,000 customers.

A typical RCGA investor paid between $5,000 and $25,000 for a portfolio of coins. In the rare coin market, the value of a coin is dependent upon its "grade," which is a numismatic measure of comparative wear on a 70 point scale. Small distinctions in grade can yield large differences in the value of a coin. For example, among relatively pristine, uncirculated "mint state" ("MS") coins, an MS65 coin can fetch ten times the price of an MS63. For "certified" coins, grade is determined by a certification service which typically employs a panel of numismatists. Prior to 1986, the only independent grading service was the American Numismatic Association Certification Service ("ANACS"). For "raw" coins (which have not been certified), grade and value may be established between two knowledgeable collectors, or an amateur may rely on the representation of a respected numismatist. Most of the raw and certified coins which RCGA supplied its customers were purported to be MS65 coins.

---

* Judge Skinner, of the District of Massachusetts, sat by designation, heard oral argument in this matter and thereafter recused himself. The remaining two panelists therefore issue this opinion pursuant to 28 U.S.C. § 46(d).

By mid–1986, at least two federal agencies had received many complaints from RCGA customers asserting that the coins sold by RCGA were of substantially lower quality and value than represented. After a preliminary investigation in July 1986, the United States Postal Service applied for and was granted authority by the late Chief Judge Andrew Caffrey of the District of Massachusetts to intercept RCGA's mail.

At the same time, the Federal Trade Commission ("FTC") was conducting a parallel nationwide investigation of the rare coin investment market. The investigation quickly focused on RCGA, among others. On September 16, 1986, the FTC instituted a civil action alleging that RCGA was engaged in unfair and deceptive business practices under 15 U.S.C. § 45(a). This case was also assigned to Judge Caffrey, who forthwith entered a temporary restraining order "freezing" not only the business but the personal assets owned by Kayne and Kalp. On October 14, RCGA filed a Chapter 11 petition for bankruptcy reorganization, which was removed to the district court and consolidated with the Postal Service and FTC actions. The following week, Judge Caffrey granted preliminary injunctions requested by the Postal Service and the FTC, and appointed a Bankruptcy Trustee, who initiated adverse proceedings against Kayne and Kalp.

The conclusion of the civil litigation came the following spring, when the FTC, the Trustee, Kayne, and Kalp entered into a settlement agreement requiring Kayne and Kalp to surrender $2.2 million in personal assets to the Trustee and never to market coins to the public again. Also pursuant to this agreement, the FTC's claim for $11.9 million in consumer restitution was given priority status for payment of the Trustee.

On January 11, 1991, an indictment charging Kalp and Kayne with 29 counts of mail fraud was filed, based on the correspondence intercepted the summer of 1986. The prosecution's evidence consisted of testimony from former RCGA employees, financial planners, suppliers, and customers, as well as coin dealers and numismatic experts. After almost six weeks of testimony, the jury convicted Kayne and Kalp of 15 counts of fraud. The prosecution dropped nine counts prior to their submission to the jury, the jury acquitted on four counts, and the district judge acquitted on one count. Defendants have been sentenced to 36 months' imprisonment and ordered to pay $339,466 in restitution. The sentence has been stayed pending resolution of this appeal.

## II. DISCUSSION

### A. Double Jeopardy

■ Both defendants have asserted that jeopardy attached to the 1986 civil litigation and should bar this prosecution. This defense has surfaced for the first time on appeal. Even though the fundamental constitutional issue of double jeopardy was not raised at trial, we will entertain the appeal, but review only for plain error.[1] *See, e.g., United States v. Rivera*, 872 F.2d 507, 509 (1st Cir.), *cert. denied*, 493 U.S. 818, 110 S.Ct. 71, 107 L.Ed.2d 38 (1989).

■ The Double Jeopardy clause protects against "multiple punishments for the same offense," even if one of the proceedings is civil and one criminal, regardless of the sequence. *United States v. Halper*, 490 U.S. 435, 439, 109 S.Ct. 1892, 1896–97, 104 L.Ed.2d 487 (1989). In determining whether the protections of the Double Jeopardy Clause are implicated, our first line of inquiry is whether the civil sanction constituted "punishment," *see United States v. Stoller*, 78 F.3d 710, 720–21 (1st Cir.1996); our second is whether the purported punishments are for the same offense, *Halper*, 490 U.S. at 439, 109 S.Ct. at 1896–97 . Because we conclude that the civil sanction in this case did not constitute punishment, we discern no plain error.

---

1. The government argues that the defendants' appendix consists almost entirely of documents which were not part of the record below and which the district court declined to certify to this court, and therefore they should be stricken from the appendix. *See Massachusetts v. United States*

*Veterans Admin.*, 541 F.2d 119, 123 n. 5 (striking portions of an appendix that were not part of the record in the district court). Even assuming these documents are properly before us, defendants cannot prevail.

Defendants argue that the civil proceedings against them were the equivalent of civil forfeiture proceedings and imposed punishment for the same offense in two or more separate proceedings. In characterizing their settlement with the Bankruptcy Trustee and the FTC as a punitive forfeiture, they cite two expansive double jeopardy opinions from other circuits which, since oral argument, have been reversed by the Supreme Court. *See United States v. Ursery,* 59 F.3d 568 (6th Cir.1995), *rev'd* —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996); *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210 (9th Cir.1994), *rev'd sub nom. Ursery,* —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549.

Assuming, *arguendo,* that the civil proceeding against defendants is the equivalent of a civil forfeiture proceeding, the Supreme Court's opinion in *Ursery* makes it clear that the 1986 civil proceeding was not "punishment" for double jeopardy purposes. *Ursery,* —— U.S. at ——, 116 S.Ct. at 2143. In that case, the Supreme Court reaffirmed its "traditional understanding that civil forfeiture does not constitute punishment for the purpose of the Double Jeopardy Clause." *Id.*

Furthermore, even to the extent that defendants' 1986 civil proceeding was not a civil forfeiture proceeding, it was by nature remedial. The monetary sanction was exacted in a bankruptcy case, and the $2.5 million paid to the trustee was used to pay a portion of claims against the defendants totalling $11.8 million resulting from their sale of coins. A monetary sanction which has no punitive function, *i.e.,* has no purpose other than restitution or compensation for the loss engendered by the defendants' conduct is not punishment within the ambit of the double jeopardy clause. *Halper,* 490 U.S. at 446–49, 109 S.Ct. at 1900–02. This is a near-perfect exemplar of compensation for loss, and does not constitute punishment for purposes of double jeopardy, notwithstanding its financial impact on the defendants.

In view of our conclusion that there was no duplication of punishment, it is unnecessary to consider the second part of the double jeopardy analysis: whether the purported punishments were for the same offense. In any case, we note that the offenses charged in this indictment contain crucial elements that by no stretch of the imagination could be part of the resolution of the bankruptcy case or of the underlying FTC and Postal Service cases; e.g., criminal intent to defraud and devising a scheme to defraud. Hence there was no double jeopardy. *See Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

## B. Evidentiary Challenges

### 1. Appraisals and valuations by dealers of "raw" coins supplied by RCGA

The defendants argue that evidence of the value of the coins sold by the defendants was erroneously admitted. The government offered, and the district court admitted, testimony of eight coin dealers that the coins bought by the RCGA customers were of substantially lower quality and value than represented in the accompanying documentation. On appeal, the defendants argue that this testimony was not properly the subject of expert testimony and was irrelevant, neither of which grounds were argued to the district judge. As neither ground was argued below, we review only for plain error. *See, e.g., United States v. Montas,* 41 F.3d 775 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1986, 131 L.Ed.2d 873 (1995).

The value of the coins involved in a prosecution for their fraudulent sale is indisputably relevant. The fact that the subject matter is not "scientific" is no bar to admissibility of expert testimony. Federal Rule of Evidence 702 specifies that expert testimony covering "scientific, technical, or other specialized knowledge [which] will assist the trier of fact to understand the evidence or to determine a fact in issue" is admissible. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469 (1993) (emphasis omitted). A trial judge "enjoys broad discretion in determining the admissibility of expert testimony." *Montas,* 41 F.3d at 783. Opinions of value are a traditional subject of expert testimony, and it is well within the

discretion of the district judge to admit them. One could hardly expect a lay jury to form conclusions about such an esoteric subject as the value of rare coins without the help of experts. The defendants complain, however, that the opinions were not based on consistent standards, and were subject to factors of taste and assessment of the market, and that the experts often disagreed among themselves. This is not unusual. These matters are properly the subject of searching cross-examination. *See Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798. Defendants argue further that this testimony should have been excluded under Fed.R.Evid. 403, because its prejudicial effect outweighed its probative value. This determination is committed to the sound discretion of the trial court, and will be overturned only in "extraordinarily compelling circumstances," *Montas,* 41 F.3d at 783, which we do not detect in this case. Review of the record reveals that the experts were experienced, the chains of custody of the coins were carefully established, the experts' methods were explained, and the appraisals were reasonably current. Thorough cross-examination was permitted on all of the issues, such as subjective judgments and variable markets, which might impeach the expert testimony. We perceive no error, plain or otherwise.

## 2. Purchasers' evidence of resale

■ Defendants complain further that several of the purchasers from RCGA were permitted to testify about the price they realized on resale of the coins. *See United States v. DiMarzo,* 80 F.3d 656, 659–60 (1st Cir.1996). Their argument that this testimony was outside the competence of lay witnesses under Fed.R.Evid. 701 is far off the mark. This testimony was not opinion testimony at all, but a simple recitation of an observed phenomenon: the price paid for the coins. A more cogent argument is that these may have been distress prices, rather than fair market prices. This might have been a ground for exclusion in a clear case of a distress sale, but whether they were distress sales or not, in the context of the evidence in this case, was a question of fact properly left to cross-examination and ultimately to the jury. This was the procedure correctly permitted by the district judge.

## 3. ANACS' evaluations of RCGA raw coins

Defendants challenge the admission of testimony concerning the grades the American Numismatic Association Certification Service (ANACS) assigned to certain coins sold by RCGA. Throughout the trial the government attempted to introduce ANACS certificates of value obtained after RCGA's bankruptcy by two dissatisfied customers, Dr. Anthony Scapicchio ("Scapicchio") and Caleb Morgan ("Morgan"). While Morgan's coins were not the subject of any count of the indictment, Scapicchio's were the subject of Count VIII. The ANACS graders who prepared these certificates were not available for cross-examination, and, indeed, were not even identified.

On the fourth day of trial, the district judge conditionally admitted the certificates, based on the testimony of Richard Montgomery, director of ANACS from 1980 to 1987, concerning ANACS' valuation procedure. The next day, the judge allowed Morgan to read his certificates to the jury. The day after that, the judge excluded a similar reading by Scapicchio and struck the Morgan testimony. Finally, on the sixteenth day of trial, the court ruled that "the jury is fully informed and is in a position to make a discriminating judgment about how reliable, if at all, the ANACS determinations are," and permitted a postal inspector to read the Morgan and Scapicchio certificates to the jury at the close of the government's case. Since specific objections were made to the admission of these certificates, we review for abuse of discretion. *See, e.g., Cameron v. Otto Bock Orthopedic Industry, Inc.,* 43 F.3d 14, 16 (1st Cir.1994).

■ We find no such abuse here. The foundation for admission of a business record under Fed.R.Evid. 803(6) requires both the testimony of a qualified custodial witness and a showing that the declarant was a person with knowledge acting in the course of a regularly conducted business activity. *See, e.g., Petrocelli v. Gallison,* 679 F.2d 286, 290 (1st Cir.1982). Montgomery's evaluation

adequately established the genesis of the records and their subsequent custody. *See, e.g., Wallace Motor Sales v. American Motors Sales Corp.*, 780 F.2d 1049, 1061 (1st Cir. 1985) (noting that the qualifying witness need not have actually prepared the record, but "is simply one who can explain and be cross-examined concerning the manner in which the records are made and kept").

Further, we do not find that the "source of information of the method or circumstances of preparation indicate lack of trustworthiness" in the certificates. Fed.R.Evid. 803(6) (excluding business records on that basis); *see Petrocelli*, 679 F.2d at 291 (excluding business record testimony where the records were "so cryptic that pure guesswork and speculation [was] required to divine the source of the cited information"). It was not for the trial judge, but the jury, to determine whether the opinions in the certificates reliably assigned values to the coins. Indeed, the district court allowed the defense to conduct liberal (if not excessive) inquiry into the unreliability of the ANACS certificates.

■ Defendants also challenge the admissibility of this evidence on constitutional grounds, claiming that they were denied their Sixth Amendment right of confrontation.[2] We find *Manocchio v. Moran*, 919 F.2d 770 (1st Cir.1990), *cert. denied*, 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), controls our analysis in this matter. There, the government sought to enter an autopsy report about an autopsy performed by a forensic pathologist who had since moved to Israel. The testimony of another signatory to the report, the keeper of the records, was offered in order to lay the foundation for admission. *Id.* at 772. Relying on *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1125–26, 89 L.Ed.2d 390 (1986), we found that the government was not required to demonstrate the examining pathologist's unavailability in order to enter the report.

We specifically stated that the reasoning in *Inadi* which led us to that conclusion would apply equally to other types of hearsay exceptions—including business records. *Id.* at 774; *see White v. Illinois*, 502 U.S. 346, 354, 112 S.Ct. 736, 741–42, 116 L.Ed.2d 848 (1992) ("[U]navailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding."). Having determined that, our decision in *Manocchio* noted that it was "left . . . with reliability as the determining factor for the admissibility of the autopsy report under the Confrontation Clause." *Manocchio*, 919 F.2d at 776. However, we specifically noted that reliability could be shown by "showing that the evidence falls within a firmly rooted hearsay exception." *Id.; see White*, 502 U.S. at 356, n. 8, 112 S.Ct. at 742–43 n. 8 (noting that "'firmly rooted' exceptions carry sufficient indicia of reliability to satisfy the reliability requirement posed by the Confrontation Clause"); *United States v. Trenkler*, 61 F.3d 45, 64 (1st Cir.1995) (Torruella, C.J., dissenting on other grounds). Since we have already shown that to be true in the present case, we need not address this argument further.[3]

### C. Sufficiency of the Evidence

■ Appellants next challenge the sufficiency of the evidence marshalled against them. We review such challenges to "determine whether a rational jury could find guilt beyond a reasonable doubt," *United States v. Flores–Rivera*, 56 F.3d 319, 323 (1st Cir.1995), viewing the evidence in the light most favorable to the verdict, *id.* Our review of the record here persuades us that the evidence was sufficient to warrant conviction beyond a reasonable doubt.

First, the government presented extensive evidence of systematic overgrading. Ten customers testified that they sold their port-

---

2. The Government argues that defendants have waived this issue by failing to object on Confrontation Clause grounds below. Regardless of whether the issue was waived, the argument fails.

3. Defendants seek to rely on the Confrontation Clause analysis in *United States v. McClintock*, 748 F.2d 1278 (9th Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). However, that opinion was written before *Inadi* or *White* were decided. Rather than look to *McClintock* for guidance, therefore, we will apply the case law of this circuit, which has been informed by the later Supreme Court decisions.

folios for a small fraction of the purchase price. Two experts indicated that the coin market did not account for this precipitous drop. Two suppliers of RCGA's coins indicated that Kalp only purchased MS63 coins. An expert witness correlated RCGA's records with pricing data and determined that RCGA only paid MS63 prices for the coins it sold to consumers. Several former RCGA employees testified *inter alia* that coins were routinely upgraded. One employee testified that Kayne ordered her to alter an ANACS certificate.

As for the ANACS certificates, as noted above, the district court allowed the defense liberal inquiry into their unreliability. Indeed, defense counsel was repeatedly allowed to cross-examine coin dealers on subjects well beyond the scope of direct examination. Although the court invited the defense to propose a limiting instruction, this offer was not accepted. The testimony about the certificates came into evidence after eleven separate appraisals were presented to the jury. Neither the ANACS documents nor the appraisals were allowed to come into evidence, and the district judge required the prosecution to structure the presentation of the certificates to be virtually identical to the appraisals.

Third, systematic overgrading was only a part of the government's demonstration of fraud. Several employees indicated that statements in RCGA's promotional literature were misleading by stating that RCGA had achieved $90 million in sales, had a multimillion dollar inventory, and had a Paris affiliate. Five customers whom RCGA cited as making substantial profits on a "liquidation" report sent to prospective investors testified that they never received payment, or were paid only after instituting civil litigation. There was evidence of a $1 million discrepancy in RCGA's books, that Kayne encouraged financial planners to conduct transactions in cash, and that Kayne and Kalp routinely skimmed cash from office accounts.

### D. Ineffective Assistance of Counsel

We trumpet the message for the umpteenth time that allegations of ineffective assistance of counsel must be raised initially before the district court, typically by a motion under 28 U.S.C. § 2255. *See, e.g., United States v. Costa,* 890 F.2d 480, 482–83 (1st Cir.1989) (discussing rationale behind rule). Moreover, the asserted ineffective assistance of counsel consisted of counsel's failure to raise the issue of Double Jeopardy; in view of our ruling on that claim, it may simply be that trial counsel was quite perceptive.

### III. *CONCLUSION*

For the foregoing reasons, the opinion of the district court is *affirmed.*