UNITED STATES of America.,

v.

**NUMISGROUP INTL. CORP.; Numismatic Asset Strategies, Inc.; Galerie Des Numismatique, Ltd.; Meridian Numismatics, Inc.; and Robert Dupurton, Defendants.**

No. 00–CR–352.

United States District Court,
E.D. New York.

Oct. 26, 2001.

---

Loretta Lynch, United States Attorney, Eastern Dist. of N.Y., Brooklyn, NY by Michael Cornacchia, Demetri M. Jones, and Kevin Mulry, Asst. United States Attorneys, for U.S.

Grover & Bloch, P.C., New York City (Douglas E. Grover, Richard W. Levitt, of counsel), for Defendants Numisgroup International Corp., Numismatic Asset Strategies, Inc., Galerie Des Numismatique, Ltd., Meridien Numismatics, Inc., Robert DuPurton,.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This decision addresses the interesting issue of whether the existence of objective

and subjective grading factors immunizes a seller of coins from a criminal charge of fraudulently misrepresenting the grade and value of coins to prospective purchasers.

Defendant corporate entities Numisgroup International Corp., Numismatic Asset Strategies, Inc., Galerie Des Numismatique, Ltd., Meridian Numismatics Inc., and the President and Chairman of each entity, Robert DuPurton (collectively, "the Numisgroup Defendants"), were convicted after a ten week jury trial of conspiracy to engage in mail fraud, various substantive counts of mail fraud, and conspiracy to engage in wire fraud. Presently before the Court are the motions by the Numisgroup Defendants for a judgment of acquittal, pursuant to Fed.R.Crim.P. 29(c).

### BACKGROUND

The evidence introduced by the Government at the trial established the following facts. Numisgroup International Corp., Numismatic Asset Strategies, Inc., Galerie Des Numismatique, Ltd., and Meridien Numismatics, Inc. are New York Corporations engaged in selling rare coins, an exceptionally specialized product unfamiliar to the general purchasing public. As part of this enterprise, the defendant corporations employ salespeople who answer telephone calls from potential customers responding to newspaper advertisements placed by the Numisgroup Defendants in such national publications as the Wall Street Journal and USA Today. Some salespeople had worked for other coin selling companies and brought their client list or "book" with them to Numisgroup.

Customers purchased coins from the Numisgroup Defendants based upon the representations that a particular coin's condition was of a specific overall quality or "grade." Numisgroup customers paid between $452 and $293,570 for the coins they purchased from the Numisgroup Defendants. However, subsequent appraisals of the coins purchased by Numisgroup customers established that most of the coins had been purchased at a price well above the fair market value and as much as ten to fifteen times the fair market value in many instances. According to the subsequent coin appraisals, most Numisgroup customers incurred a substantial financial loss as a result of these purchases. In order to better understand the parties' arguments and the fraudulent conduct involved in this case, a brief discussion of numismatic terminology and the process of coin grading is in order.

Numismatics is the study of coins or other forms of currency. The fair market value of a coin is established by its "grade" and authenticity. A grade is a numismatic measure of a coin's overall quality, comparative wear, originality and state of preservation on a 70 point scale. Coin grading is a necessary corollary of coin collecting. A coin is placed under an overhead incandescent lamp, sometimes viewed through a magnifying eyepiece, and is typically graded by a numismatic expert. The highest grade a coin can receive is an uncirculated "mint state" ("MS") 70. A coin earning an exceedingly rare uncirculated MS–70 grade will have no surface defects, its original full mint luster, a full strike, with exceptional eye appeal. It is significant, that slight variations in the grade of a coin can cause substantial variations in value. For example, a coin graded MS–66 can command up to ten times the price of a coin graded MS–64. A "certified" coin is a coin that has been graded by a numismatic grading service. Once the coin has been graded, a certificate reflecting that grade is produced and the coin is encapsulated in a hard plastic folder that is sonically welded together. A "raw" coin is a coin that has not received a grade certi-

fied by a numismatic grading service and is not encapsulated.

According to the Government, between 1996 and 2000, the Numisgroup Defendants engaged in a conspiracy to commit mail fraud and wire fraud by using the United States Postal Service and wire transmissions in furtherance of a scheme to defraud purchasers of coins. The gravamen of the offenses charged is that in selling these rare coins, Robert Dupurton and salespeople employed by him made fraudulent representations to coin purchasers as to the grade and value of the coins sold. The prosecution contends that the Numisgroup Defendants would intentionally verbally misrepresent the grade and therefore the value of the coins during telephone sales calls with customers and again misrepresent that false grade on the invoice mailed along with the coin when it was delivered.

The indictment was filed on April 5, 2000. Count 1 of the indictment alleged that each Numisgroup Defendant engaged in a conspiracy to commit mail fraud by using the United States Postal Service in furtherance of a scheme to injure and defraud purchasers of rare coins by fraudulently misrepresenting the grade and value of the coins they sold. Counts 2 through 32 charged various combinations of Numisgroup Defendants with individual substantive acts of mail fraud involving sales to Numisgroup customers between 1996 and 2000. Lastly, Count 33 alleged that two Numisgroup Defendants engaged in a conspiracy to commit wire fraud.

### DISCUSSION

#### A. Fed.R.Crim.P. 29 standard

Federal Rule of Criminal Procedure 29(c), governing motions for judgment of acquittal after the jury has been discharged, provides that:

If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal.... It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury.

A defendant challenging his conviction on sufficiency grounds faces a "heavy burden," as stated by the Second Circuit in *U.S. v. Matthews,* 20 F.3d 538, 548 (2d Cir.1994). "When a defendant challenges the sufficiency of the evidence underlying his conviction, we review the evidence in the light most favorable to the government, drawing all possible inferences in favor of the prosecution.... The ultimate question is not whether we believe the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find." *U.S. v. Payton,* 159 F.3d 49, 55–56 (2d Cir.1998).

The Court must "draw all inferences and resolve all issues of credibility in the government's favor," *U.S. v. Canady,* 126 F.3d 352, 356 (2d Cir.1997); and review the pieces of evidence as a whole, "not in isolation." *U.S. v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994), cert. denied, 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995). These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. U.S.,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942); *U.S. v. Giraldo,* 80 F.3d 667, 673 (2d Cir.1996). Further, a conviction may be based "solely on reasonable inferences from circumstantial evidence...."

**344**

*U.S. v. Pinckney,* 85 F.3d 4, 7 (2d Cir. 1996) (citing *U.S. v. Fermin,* 32 F.3d 674, 678 (2d Cir.1994), cert. denied, 513 U.S. 1170, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995)). A conviction may not however, "rest on mere speculation or conjecture." *Pinckney,* 85 F.3d at 7 (citing *U.S. v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994)). The prosecution is obligated to do more than introduce evidence " 'at least as consistent with innocence as with guilt.' " *D'Amato,* 39 F.3d at 1256 (quoting, *U.S. v. Mulheren,* 938 F.2d 364, 372 (2d Cir. 1991)).

### B. As to the Sufficiency of the Evidence

As set forth above, the Numisgroup Defendants were convicted of conspiracy to engage in mail fraud, various counts of mail fraud, and conspiracy to engage in wire fraud. The Numisgroup Defendants attack the verdict as to all counts, arguing that the Government has failed to produce sufficient evidence of fraudulent intent to support any of the convictions. In the interest of clarity, the Court will address the substantive counts of mail fraud before considering the conspiracy convictions always bearing in mind that " 'the court must be careful to avoid usurping the role of the jury.' " *U.S. v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000) (quoting *U.S. v. Guadagna,* 183 F.3d 122, 129 (2d Cir. 1999)). .

#### 1. As to fraud

■ Mail fraud is governed by 18 U.S.C. § 1341 and wire fraud is governed by 18 U.S.C. § 1343. "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *Autuori,* 212 F.3d at 115 (citing *U.S. v. Zagari,* 111 F.3d 307, 327 (2d Cir. 1997), cert. denied, 522 U.S. 988, 118 S.Ct.

455, 139 L.Ed.2d 390 (1997)). The wire fraud and mail fraud statutes are construed identically. *U.S. v. Covino,* 837 F.2d 65, 71 (2d Cir.1988); *see U.S. v. Muni,* 668 F.2d 87, 89 n. 3 (2d Cir.1981) (noting that wire fraud statute has been interpreted similarly to mail fraud statute after which it was patterned).

■ Although not statutorily defined, the words "to defraud" as used in the federal mail and wire fraud statutes "commonly 'signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " *U.S. v. Altman,* 48 F.3d 96, 102 (2d Cir.1995) (quoting *Hammerschmidt v. U.S.,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)). " 'Essential to a scheme to defraud is fraudulent intent.' " *Autuori,* 212 F.3d at 116 (quoting *U.S. v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994)); *see also U.S. v. Bouyea,* 152 F.3d 192, 194 (2d Cir.1998) (The crux of mail fraud is "an intent to defraud").

To demonstrate an intent to defraud, the Government must "prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *U.S. v. Dinome,* 86 F.3d 277, 283 (2d Cir.1996) (quoting *U.S. v. Starr,* 816 F.2d 94, 98 (2d Cir.1987)); *see also In re Registry Publishing,* 68 F.3d 577, 580 (2d Cir.1995) ("In order to establish that the defendant acted with an intent to defraud, the Government must show that some actual harm or injury was contemplated by the schemer.") (internal quotation marks omitted); *D'Amato,* 39 F.3d at 1257. However, "proof need only be sufficient to establish a specific intent [to defraud, which] need not necessarily be proved by direct evidence, but may also be inferred from the defendant's actions and other circumstantial evidence." *Zagari,* 111 F.3d at 327 (quoting *U.S. v. Gelb,* 700 F.2d 875, 880 (2d Cir.1983), cert. denied,

464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983)).

Because the defendant must intend to harm the victims of the fraud, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr*, 816 F.2d at 98. It is important to note that, "The harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *U.S. v. Starr*, 816 F.2d 94, 98 (2d Cir.1987) (quoting *U.S. v. Regent*, 421 F.2d 1174, 1182 (2d Cir.1970)). "When it is clear that a scheme, viewed broadly, is necessarily going to injure, it can be presumed that the schemer had the requisite intent to defraud." *U.S. v. Chacko*, 169 F.3d 140, 148 (2d Cir.1999) (citing *U.S. v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir.1970)) (intent to injure may be inferred, particularly where the scheme has the effect of injuring as a "necessary result of carrying it out").

An element of the federal mail fraud and wire fraud statutes is "materiality of falsehood." *Neder v. U.S.*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *Autuori*, 212 F.3d at 118 (quoting *U.S. v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir.1994)). In *Starr* and *Regent*, the Second Circuit found that in order to establish mail fraud, there must be some harm contemplated to the victim of the fraud that goes to the nature of the bargain itself. *See Starr*, 816 F.2d at 99 (finding no fraud because "there was no discrepancy between benefits reasonably anticipated and actual benefits received"

(internal quotation omitted)); *Regent*, 421 F.2d at 1182 (finding no fraud when the misrepresentations did not "affect[ ] the customer's understanding of the bargain nor ... influenc[e] his assessment of the value of the bargain to him"). If defendants "in no way misrepresented to their customers the nature or quality of the service they were providing," then statutory mail fraud cannot exist. *Starr*, 816 F.2d at 99.

Also, "Since an essential element of the crime charged is an intent to defraud, it follows that good faith on the part of the defendant is a complete defense to the charge of mail fraud[.]" *U.S. v. Rossomando*, 144 F.3d 197, 199 (2d Cir.1998). " 'If an individual believes that the information set forth in a mailing [or wire transmission] is true, it follows that he cannot have the requisite intent to defraud. The government must prove lack of good faith beyond a reasonable doubt' " *U.S. v. Somerstein*, 971 F.Supp. 736, 741 (E.D.N.Y.1997) (quoting *U.S. v. Alkins*, 925 F.2d 541, 550 (2d Cir.1991)), and the jury was so charged.

■ In their major argument fortified by oral argument, the Numisgroup Defendants assert that there was insufficient evidence to sustain the guilty verdicts returned by the jury because, as the Government's experts conceded, the grading of coins is largely subjective. The defense contends that there are two levels of subjectivity at work in such grading. First, the defense argues that there is subjectivity within a particular grading standard. In other words, two numismatic experts employed by the same grading service and working within the same established grading system often disagree among themselves over a coin's grade. Second, in addition to the existence of subjectivity within an individual grading service's particular standards, the defense contends

that there is also subjectivity within the entire coin industry because the industry has not adopted a monolithic coin grading standard. According to the Numisgroup Defendants, because coin grading is subject to highly individualistic interpretations within each of these two levels, the jury was precluded from finding that the grade of the coins was intentionally misrepresented.

Applying the standards as set forth above, the Court finds that the Government has supplied sufficient evidence of mail fraud to sustain the convictions under Counts 2 through 32. The evidence demonstrates that the Numisgroup Defendant's representations with regard to the grade and in some instances the value of the coins were false, and that these representations were made with an intent to defraud sufficient to warrant conviction beyond a reasonable doubt.

The Government presented testimony from two experts for purposes of establishing that coins were graded based on largely objective criteria and that, at the time a coin is sold, it's market value could be readily determined. The Government also presented evidence that the Numisgroup Defendants intentionally and systematically overgraded the coins that they sold.

The first Government expert, Richard Montgomery, has been involved with coins on a full-time basis for 21 years. His experience includes employment in the certification service department of the American Numismatic Association where he was an authentication trainee and received specialized training in counterfeit detection. Montgomery has personally graded in excess of 5 million coins. At the time of the trial, Montgomery was the president of the Professional Coin Grading Service ("PCGS"). PCGS is a numismatic grading service that does not put a monetary value on the coins it grades. Starting in 1986, PCGS created a product intended to facilitate the sight-unseen purchase and sale of coins. It developed a grading service employing professional graders and it permanently sealed the coins in plastic. Also, it maintained a network of dealers willing to agree with the grading standards of PCGS and to purchase coins, sight unseen, at a regularly quoted bid and ask price which each dealer established without reference to any other dealer. Montgomery testified that his main function at PCGS is to perform a "final quality check" or verify the grade assigned to a coin. Montgomery graded the coins at issue in the chart known as Government's Exhibit 1300.

The Government's second expert witness, Anthony Swiatek, graded and appraised the value of each coin. Swiatek has owned a coin buying and selling business since 1979. At the time of the trial, Swiatek had just completed two consecutive terms as president of the American Numismatic Association. He had also authored three published books covering coin history, coin grading, and coin investment potential. In addition, Swiatek has published articles in several weekly coin publications. Like Montgomery, Swiatek attended the American Numismatic Association's counterfeit coin detection program and several coin grading classes.

Montgomery and Swiatek conceded that the coin industry lacked a unified and homogeneous grading standard. However, each provided a careful explanation of the intricacies supporting their respective methods of grading. Montgomery described the grading structure of coins within the industry and indicated that a coin is graded based on the following four primary components: (i) luster: meaning the original brilliance of the coin; (ii) contact marks: meaning the degree of contact marks a coin has incurred when "dinged,"

nicked, or scratched, for example, by another coin; (iii) strike: based on how well the blank coin face came together with the dye used during minting, and how detailed and defined is the design on both sides of the coin; and (iv) eye appeal: meaning the coin's overall attractiveness particularly in regard to toning and coloration.

After a coin is examined, it is categorized within a grade range and assigned a numeric grade. The grade range, in descending order of condition, is as follows: uncirculated, about uncirculated, extremely fine, very fine, fine, very good, good, about good, fair and poor. An uncirculated coin is a new coin, typically received directly from the Federal Reserve, which has never been spent or distributed to the public, while a circulated coin is in use or has been spent. In addition, a coin can also be defined as being struck as a "proof" coin intended for collectors.

The numerical grade corresponds with the descriptive grade range. For example, a coin graded with the highest grade range of uncirculated is considered to be in "mint-state" ("MS") and will receive a corresponding numerical grade between 60 and 70, while a coin within the almost uncirculated ("AU") category will receive a numerical grade between 50 and 58. PCGS has a policy that it will not grade counterfeit coins, cleaned coins or coins with altered surfaces.

The Government also demonstrated that there are several weekly periodicals that report price developments affecting various coin types. Coin World Trends includes a general commentary on the status of the coin market, as well as several pages of prices. As to newsletters, one appears to be the standard in the field. The Coin Dealer Newsletter, frequently referred to as the "Grey Sheet," is widely subscribed to by sophisticated investors and dealers. The publication offers pric-

ing examples of various privately certified coins by type and by some individual dates and mintmarks. The Grey Sheet attempts to post benchmark prices that are representative of the market and, in addition, attempts to list the highest recorded price for each grade quoted.

The Coin Dealer Newsletter contains a section entitled the "Certfied Coin Market Indicator" stating which grading services receive the highest percentage of the price set forth in the Coin Dealer Newsletter on the open market. Each edition of the Newsletter received in evidence ranked PCGS first among all coin grading services in that a coin graded and encapsulated by PCGS would bring on average, approximately 89–92% of the price stated in the Newsletter.

Absent a handful of coins certified by the Accugrade grading service, the Numisgroup Defendants exclusively supplied their own grades on the coins they sold. The Government adduced direct evidence that Dupurton graded and established the selling price of each raw coin. Furthermore, there was evidence that Dupurton would crack open coins that had been certified and encapsulated by other grading services and re-grade the coins applying his own standards. In this review, the Court must determine whether, by applying their own grading standards against the backdrop of a coin industry that has no uniform standard, the Numisgroup Defendants contemplated that a consumer would be deceived by the grade represented to him during sales calls and on shipping invoices and, as a result, would also incur financial injury.

In its determinations, the Court takes useful guidance from the Second Circuit decision in *U.S. v. Rowe,* 56 F.2d 747, 749 (2d Cir.1932), cert. denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932), in which Judge Learned Hand wrote:

True, the law still recognizes that in bargaining parties will puff their wares in terms which neither side means seriously, and which either so takes at his peril ... but it is no longer law that declarations of value can never be a fraud. Like other words, they get their color from their setting, and mean one thing when exchanged between traders, and another when uttered by a broker to his customer. Values are facts as much as anything else; they forecast the present opinions of possible buyers and sellers, and concern existing, though inaccessible, facts. Such latitude as the law accords utterances about them, depends upon the hearer's knowledge that the utterer expects him to use his own wits; and while it may once have been true that one might safely use them to stuff any gull one brought to hand, liability has expanded as the law has become more tender towards credulity.

In the seminal decision in *U.S. v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970), the Second Circuit stated that an intent to defraud could be found in sales tactics that misrepresent the usefulness of an item. The court observed that:

> cases sustaining convictions for mail fraud have involved sales tactics and representations which have tended to mislead the purchaser, or prospective purchaser, as to the quality or effectiveness of the thing being sold, or to mislead him with regard to the advantages of the bargain which should accrue to him. Thus claims or statements in advertising may go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it.

*Id.,* (citing *U.S. v. Andreadis,* 366 F.2d 423 (2d Cir.1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967)).

Accordingly, for a sales tactic to rise to the level of mail fraud, the representations must be false and deceiving as well as material to the bargain struck between the parties, and, also deprive the purchaser of the benefit of the bargain; so that he does not receive what he paid for. *See Regent,* 421 F.2d at 1182; *see also Rowe,* 56 F.2d at 749 ("[a] man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him.")

In *Regent,* sales agents made misrepresentations to potential customers of nationally advertised brands of stationary regarding how the agent had been referred to the particular customer. *See id.* at 1176. The agent also misrepresented that he was a doctor, or other type of professional who had stationary to be disposed of. *Id.* Although the sales agents made misrepresentations to the customers in order to make a sale, the Second Circuit found that those misrepresentations were not material to the bargain because the deceit did not go to the nature of the bargain itself and the customers, none of whom testified that they had been cheated, received the exact products for which they had bargained. *Id.* at 1180.

The harm contemplated in a scheme to defraud "is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *U.S. v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) (quoting *Regent* 421 F.2d at 1182). The Numisgroup Defendants argue that the inherently subjective nature of coin grading precludes the jury from find-

ing such a discrepancy. However, as a general proposition, "The appraisal of any property that does not have frequently traded identical substitutes will necessarily be guided by both objective and subjective considerations." *In re MDL–731—Tax Refund Litigation*, 989 F.2d 1290, 1299 (2d Cir.1993).

In *U.S. v. Kail*, 804 F.2d 441 (8th Cir. 1986), a case somewhat factually similar, the Eighth Circuit affirmed a conviction of a coin dealer on fifteen counts of mail fraud. The defendant sold coins to consumers based upon the representations that this would be an excellent investment opportunity and that the coins were sold at their fair market value. Subsequent appraisals of the coins purchased by the dealer's clients demonstrated that many of the coins were sold at a price well in excess of the fair market value, rendering the coins virtually useless as an investment vehicle. *Id.* at 443. Asserting that there was insufficient evidence to support his conviction, the coin dealer contended that "because the valuation of coins is inherently subjective" "there were honest differences of opinion and judgment as to the grade and value of the coins, therefore furnishing no basis for a finding that [he] had committed fraud." *Id.* at 445.

The court in *Kail* found that the evidence established the existence of official coin grading standards that, "while not having the force of law, were recognized by the Government's experts as having wide acceptance in the industry." *Id.* Furthermore, after acknowledging "the fact that the coin grading process is inherently subjective" the court also found that the experts' appraisals of the coins sold by the dealer "were consistent in demonstrating a pattern of over valuation." *Id.* The court concluded that the jury could reasonably infer that the dealer's pricing practice "was so far beyond the limits of custom and practice in the [coin] industry" as to warrant a conviction of mail fraud. *Id;* see also *U.S. v. Robie*, 166 F.3d 444 (2d Cir.1999) (the jury's finding that misprinted postage stamps were worth more than twice their nominal value was supported by defendant's apparent knowledge as stamp collector that, with the right misrepresentation, stamps could be sold for significant sums).

In *U.S. v. Kayne*, 90 F.3d 7 (1st Cir. 1996), cert. denied, 519 U.S. 1055, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997), the First Circuit affirmed the conviction of coin dealers on fifteen counts of mail fraud based on the finding that they sold coins of substantially lower quality and value as represented and disseminated in misleading promotional literature to their customers. Among their arguments, the defendants asserted that the testimony of the Government's expert witnesses demonstrating that the coins bought by the defendant's customers were of substantially lower quality and value then represented in the accompanying literature was not properly the subject of expert testimony because the opinions were not based on consistent valuation standards. *Id.* at 11–12. The defendants further contended that the district court erred by admitting in evidence testimony of their customers regarding the price they realized on the resale of the coins. *Id.* at 12.

The court in *Kayne* concluded that both the testimony of the experts and the customers was properly admitted in evidence. *Id.* at 11–12. The court stated that a proper foundation had been laid for the expert testimony and that whether the resales by the customers constituted distress sales or not was a question of fact. *Id.* at 12. Therefore, the jury could infer that there was a misrepresentation as to the grade and value of the coins because of the disparity between the amount the cus-

tomers paid the defendants for the coins and the amount the customers received on the resale.

Even more recently, the Second Circuit reiterated that " '[t]he expression of an opinion not honestly entertained is a factual misrepresentation.' " *U.S. v. Autuori*, 212 F.3d 105, 119 (2d Cir.2000) (quoting from *U.S. v. Amrep Corp.*, 560 F.2d 539, 543–44 (2d Cir.1977)). In *Autuori*, the defendant represented, in a private placement memorandum to potential investors in a real estate development and syndication firm, that the company projections were "good" and "credible" despite the defendant's knowledge of variances in an audit and budgetary problems. *Autuori*, 212 F.3d at 118. The Court reversed the judgment of acquittal in part for mail and wire fraud and determined that the jury could find that the defendant's misrepresentations regarding the accuracy of the projections were material, particularly in light of his prestige as an accountant with Arthur Andersen & Co. *Id.* at 119.

In this case, the evidence adduced by the Government established that coin grading involves various factors, including some that are subjective, that are beyond the knowledge and experience of the unsophisticated purchaser. The grade of a coin is the predominant factor in a consumer's decision to purchase a coin; it is what the customer is bargaining for. One of the many sales tactics employed by the Numisgroup Defendants, the oral misrepresentation of the coin's grade, lead customers to believe that they were receiving a coin of a certain overall quality which the evidence reflects they did not receive. Dr. Charles Richardson testified that he told Dupurton that he knew nothing about coins and his purpose in purchasing coins was for investment. Dr. Richardson also testified that Dupurton told him that the grades were supplied at his company.

Q: Now, during the time that you were purchasing these coins from Numisgroup and Mr. Dupurton, did you, in any way, educate yourself about what this MS–66 or 65 meant?

A: Most of my education I received from Mr. Dupurton. . . .

Q: During the time you were purchasing coins from Mr. Dupurton and Numisgroup, did you ever ask him who supplied the grades on the coins?

A: Yes. He said they supplied it there at his company.

Montgomery graded 702 coins that were admitted in evidence. Of the 702 coins he examined, Montgomery arrived at the same grade as the Numisgroup Defendants 67 times. Montgomery graded 397 coins lower than did the Numisgroup Defendants and deemed another 200 coins ungradable because they were either cleaned, altered, or damaged. So that a total of 597 of the 702 coins were either graded lower or could not be graded because of detrimental conditions. The remaining 38 coins were of the type that PCGS did not grade. Montgomery did not grade any of the 702 coins above the grade assigned by the Numisgroup Defendants.

Furthermore, a survey of the grades determined by Montgomery with respect to the 397 coins that he graded lower demonstrates that Montgomery graded: 39 coins at 1 point lower than did the Numisgroup Defendants; 67 coins at 2 points lower; 45 coins at 3 points lower; 17 coins at 4 points lower; 17 coins at 5 points lower; 46 coins at 6 points lower; 59 coins at 7 points lower; 50 coins at 8 points lower; 20 coins at 9 points lower; and 37 coins were graded by Montgomery at 10 or more points lower than the grade assigned by the Numisgroup Defendants. This numerical breakdown leaves the Court wondering why, if coin grading standards are as inconsistent and inherently

subjective as the Numisgroup Defendants contend, not one of the 397 grades assigned by Dupurton was higher than the corresponding grade determined by Montgomery.

In addition, the Court finds that the evidence clearly reflects that the customers also believed that the value of the coin was commensurate with the explicitly represented grades. This belief is reflected in the substantial sums of money Numisgroup customers paid for the coins they received. Although the Court will not delve into the financial specifics of the hundreds of transactions conducted by each of the 17 Numisgroup customers who testified in this case, four customers in particular suffer an enormous disparity between the amount paid for the coins and the coins actual appraised value. Dr. Richardson purchased a total of 99 coins for $219,833 with an appraised value of $86,361; George Barre purchased 28 coins for $168,470 which were appraised by Swiatek at $16,415; Lanny Wells bought 154 coins at a cost of $293,570 with an appraisal value of $37,284; and Jane Falkenstein purchased 27 coins for $110,125 which received an appraisal value of $20,460.

As the foregoing figures begin to demonstrate, the representations of fact by the Numisgroup Defendants about a coin's grade were clearly false and deceiving as well as material to the bargain. *See Regent.* The Numisgroup Defendants induced prospective customers to spend large sums of money in exchange for coins with little relative value. Subsequent appraisals established that the coins involved in this case were grossly overgraded in a majority of instances and therefore valued on the open market at fractions of what the customers paid. Stated simply, the coin customers did not receive what they paid for.

Furthermore, the massive disparity between the grade the coin customers anticipated receiving and what they actually received for their money expended clearly evinces the harm contemplated by the Numisgroup Defendants in their scheme to defraud. *See Starr,* 816 F.2d at 98. The Government offered sufficient evidence that the Numisgroup Defendants intended to cause a monetary loss and to reap a huge profit at the expense of its customers as a result of false representations as to the grade and value of the coins. The Government also established that there was reliance on that deception to the customer's detriment.

The Court finds under the rules in *Autuori* and *Amrep.* that the jury could infer that grades assigned to the coins by Dupurton, as recited by the salespeople and expressly stated on the invoices, were representations contrary to Dupurton's honest view. The jury could infer that as the President and Chairman of four corporate coin-selling entities, Dupurton knew the true monetary value of the coins and was sufficiently qualified and experienced to assign relatively accurate grades, but instead chose to deliberately inflate the grades to obtain monetary advantage.

This Court is satisfied that the Government has sufficiently shown, beyond a reasonable doubt, that while subjectivity in the grading process may justify some variation in grading, this subjectivity factor cannot account for the huge differential in the grade and value of the coins. In the Court's view, a reasonable jury could have found the essential elements of mail fraud based on the intentional systematic overgrading, beyond a reasonable doubt.

**2. As to the disclaimer in the invoice**

■ The Numisgroup Defendants argue that the inclusion of the "terms of sale and disclosure statement," taken together with

the 30 day return policy, which were printed on the back of the sales invoices and specifically advised purchasers about variances in grading standards and values, undermines the proof of intent to deceive. The Numisgroup Defendants cite no authority in support of their argument.

■ However, when the allegedly misrepresented facts are peculiarly within the knowledge of the party invoking the disclaimer, even an explicit waiver will not be given effect. *Warner Theatre Assocs. Ltd. v. Metropolitan Life Ins. Co.*, 149 F.3d 134 (2d Cir.1998); *Banque Arabe Et Internationale v. Md. Nat. Bank*, 57 F.3d 146, 155 (2d Cir.1995). Furthermore, such disclaimers do not shield a seller from liability for fraudulent misrepresentations designed to induce the buyer to enter into a contract. *See Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 630–31 (4th Cir.1999) ("[A] a buyer can recover for fraudulent inducement not only where the contract contains a general disclaimer of warranties and liabilities, but also where the contract contains specific disclaimers that do not cover the allegedly fraudulent contract-inducing representations."); *see also Woodling v. Garrett Corp.*, 813 F.2d 543 (2d Cir.1987) (an integration clause in contract is no bar to a claim that its acceptance had been procured by fraud)

The Court finds that the existence of this disclaimer clause in very small print on the reverse side of the invoice cannot preclude a criminal conviction, as a matter of law. As discussed above, Dupurton graded all the raw coins sold by the four Numisgroup entities. The Numisgroup Defendants misrepresented the grades of the coins during telephone sales calls with prospective purchasers and in the invoices to induce them to buy the coins. The defendants cannot, in this manner, disclaim the very thing their customers bargained for.

This jury had the disclaimer before them for their consideration, fortified by defense counsel's able summation. The jury may have decided that a reasonably prudent coin purchaser may not read the tiny close-packed print on the back of the invoice. Or, a reasonable jury could have decided that a criminal fraud had been committed, notwithstanding the disclaimer. Accordingly, the Court will not absolve the Numisgroup Defendants of criminal liability based on this disclaimer.

### 2. Conspiracy

The charge of conspiracy is governed by 18 U.S.C. § 371, which states, in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

"It is well settled that the law of conspiracy serves ends different from, and complementary to, those served by criminal prohibitions of the substantive offense." *U.S. v. Wallach*, 935 F.2d 445, 470 (2d Cir.1991) (quoting *U.S. v. Feola*, 420 U.S. 671, 693, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975)). "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *U.S. v. Samaria*, 239 F.3d 228, 234 (2d Cir.2001) (quoting *U.S. v. Monaco*, 194 F.3d 381, 386 (2d Cir.1999), cert. denied, 529 U.S. 1028, 120 S.Ct. 1441, 146 L.Ed.2d 329 (2000)). For a criminal conspiracy,

"the government 'must prove that the intended future conduct [the conspirators] agreed upon includes all the elements of the substantive crime.'" *Samaria,* 239 F.3d at 234, (quoting *U.S. v. Pinckney,* 85 F.3d 4, 8 (2d Cir.1996)).

"Although proof of an express agreement is not required, there must be proof of 'at least a tacit understanding between the parties to further the violation of the law.'" *U.S. v. Desena,* 260 F.3d 150, 155 (2d Cir.2001) (quoting *U.S. v. Jones,* 30 F.3d 276, 282 (2d Cir.1994)). "[S]ince 'conspiracy by its very nature is a secretive operation,' the elements of a conspiracy may be established through circumstantial evidence." *U.S. v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir.1988) (quoting *U.S. v. Provenzano,* 615 F.2d 37, 45 (2d Cir.1980), cert. denied, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980)). " 'Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming." ' " *U.S. v. Tutino,* 883 F.2d 1125, 1129 (2d Cir.1989) (quoting *U.S. v. Ciambrone,* 787 F.2d 799, 806 (2d Cir.1986) (quoting *Provenzano,* 615 F.2d at 45), cert. denied, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986)), cert. denied, 493 U.S. 1081, 1082, 110 S.Ct. 1139, 1139, 107 L.Ed.2d 1044 (1990).

" '[A] coconspirator who does not directly commit a substantive offense may be liable for that offense if it was committed by another coconspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement.'" *Rosario v. U.S.,* 164 F.3d 729, 734 (2d Cir.1998) (quoting *U.S. v. Pimentel,* 83 F.3d 55, 58 (2d Cir.1996)). For criminal conspiracy, the government "must prove that the intended future conduct [the conspirators] agreed upon includes all the elements of the substantive crime." *Pinckney,* 85 F.3d at 8. Although a defendant's "mere presence" at the scene of a crime will not be enough to show that he was a member of the conspiracy, *U.S. v. Soto,* 716 F.2d 989, 991–92 (2d Cir.1983), his presence may establish his membership in the conspiracy if all of the circumstances considered together show that by his presence he meant to advance the goals of that conspiracy, *see, e.g., U.S. v. Gordils,* 982 F.2d 64, 71 (2d Cir.1992), cert. denied, 507 U.S. 1054, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993).

The existence of an overt act in furtherance of the conspiracy must also be established by the Government. "However, an overt act need not be inherently criminal to support a conspiracy conviction." *U.S. v. Montour,* 944 F.2d 1019, 1026 (2d Cir. 1991) (citing *U.S. v. Slocum,* 695 F.2d 650, 654 (2d Cir.1982), cert. denied, 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983)). "A principal reason for the overt act requirement in a conspiracy prosecution 'is simply to manifest 'that the conspiracy is at work," *Carlson v. U.S.,* 187 F.2d 366, 370 (10th Cir.1951), and is neither a project still resting solely in the minds of the conspirators nor a fully completed operation no longer in existence.'" *U.S. v. Armone,* 363 F.2d 385, 400 (2d Cir.1966) (quoting *Yates v. U.S.,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1085, 1 L.Ed.2d 1356 (1957)).

"[O]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *U.S. v. Jackson,* 180 F.3d 55, 74 (2d Cir. 1999), cert. denied, 530 U.S. 1267, 120 S.Ct. 2731, 147 L.Ed.2d 993 (2000) (quoting *U.S. v. Amato,* 15 F.3d 230, 235 (2d Cir.1994)).

■ The Numisgroup Defendants maintain that the Government failed to present sufficient evidence to support the jury's verdict of their involvement in conspiracies to commit mail and wire fraud. However,

a pattern of systematic overgrading was only part of the Government's demonstration of fraud. The testimony and exhibits admitted at trial, as considered in the light most favorable to the Government, demonstrate the following facts.

Dupurton established the grading and pricing of all of the raw coins and the pricing of the certified coins sold by the defendants. However, to make customers feel comfortable and to facilitate a sale, salespeople told customers that grading was performed by three "in-house" graders, two of whom were from PCGS. In some instances, in addition to misrepresenting the coin's grade, customers were told that a coin was worth a specific monetary value.

As to the wire fraud conspiracy, Linden Martineau purchased 23 coins from Numisgroup International Corporation and Numismatic Asset Strategies. Martineau testified that most of the coins he purchased from either Numisgroup entity were not certified, however, he was told the coin's grade by the salesperson and the grade also appeared on the invoice.

Q: So when you received coins that were not certified, who did you rely on for the grade?

A: The statement on the invoice. First of all, what they had represented them to be to me on the phone and then confirmed by the statement on the invoice, and that was it.

Martineau also obtained an 1893–O Morgan Silver Dollar graded MS–65 ("deep mirror proof like") which he received in a trade with Numismatic Asset Strategies, Inc. for 64 Double Eagle $20 Liberty coins of assorted certified grades. The 64 coins had been purchased by Martineau from the First National Reserve in Beaumont, Texas for the approximate sum of $269,000. Martineau testified that he told a Numisgroup salesperson named Brian Mills that he wished to sell the 64 coins and Mills stated that while he could not sell the coins for him, he suggested a trade. Martineau testified that Mills told him "the 1893–O Silver Dollar was extremely desirable, very valuable, and that he could arrange a trade for my gold pieces for this particular coin, and that it was to my financial advantage to do so, because this coin, the 1893–O Silver Dollar, was worth more than my whole collection of $20 gold pieces." Mills told Martineau that the 1893–O Silver Dollar was worth $454,000.

Unlike the 64 Double Eagle $20 Liberty coins which were certified and encapsulated in plastic containers, the 1893–O Silver Dollar was not certified and was bound in lucite. Nervous that the 1893–O Silver Dollar was not certified stating the grade of MS–65 ("deep mirror proof like") as he was told on the phone, Martineau attempted to return the coin ten days after receiving it. However, Numismatic Asset Strategies, Inc. would not accept the return of the coin because Martineau's account carried an outstanding balance. Significantly, the 1893–O Silver Dollar was subsequently graded by Montgomery as AU–58 and appraised at $650 by Swiatek.

In addition, the Government adduced evidence that the salespeople represented that the coins that were being sold would significantly increase in value over a short period of time and that thereafter the customer would be able to sell the coins at auction through the auspices of the defendants.

For example, in March 1998, Roxanne Christine Hollingshead was called by Ann Calta ("Caltagirone"), an individual from Numisgroup International Corporation who claimed to be the "vice-president of sales" and wanted to sell Hollingshead a 1921–S Morgan Silver Dollar graded MS–

66. Hollingshead told the individual about prior bad dealings with the company and indicated that she was not interested in purchasing additional coins from Numisgroup International Corporation. The individual responded, "send them all back, and plus pay an additional amount, and I'll send you an auction piece and we will take it to auction in May 1998." On cross-examination, Hollingshead was asked:

Q: She used the word "auction?"

A: Yes

Q: What did you understand her to mean by auction?

A: She explained it—Ann explained that it was a very rare piece that she had come to obtain and that it would probably get anywhere between 12 and $15,000 at an auction because it is a rare piece and that's where coin collectors go, and she kind of explained what the auction is all about.

Q: So she was promising you that this coin was worth a lot more money?

A: Yes.

Q: You would make money?

A: Yes.

.     .     .     .     .

Q: And she was explaining to you that you would do this by having them sell the coin for you at auction?

A: Yes.

On recross-examination, Hollingshead was questioned:

Q: And in particular, when you bought the auction piece, you were trusting what Anna Calta was telling you, not so much about value, but about the fact that we were going to take this to auction in two or three months?

A. It was value and that she was going to take it to auction. I wanted to see how it was going to work

Hollingshead returned the four coins that she had already purchased along with an additional $1,685 payment in exchange for the 1921–S Morgan Silver Dollar. When Hollingshead received the coin, it was accompanied by literature photocopied from the Coin Dealer Newsletter indicating that for a 1921–S Morgan Silver Dollar with a MS–66 grade, the bid price was $8,850 and the asking price was $9,500. Numisgroup International Corporation, however, never auctioned the coin. The "vice-president of sales" claimed that the auction had been post-poned due to a hurricane and later asserted to Hollingshead that the auction was again post-poned. Eventually, Hollingshead was told by Calta that the auction had been canceled.

Montgomery graded the 1921–S Morgan Silver Dollar at MS–62 for which Hollingshead traded four coins which cost her $5,220 plus an additional $1,685, for a total of $6,905 and remarkably, Swiatek appraised the value of that coin at $25. Prior to that, Hollingshead's local coin appraiser, employed by Toledo Coin Exchange Inc. located in Sylvania, Ohio appraised the coin at a price of $6.40. Asked why she continued to purchase coins from Numisgroup International Corporation after she had spoken to appraisers, Hollingshead responded: "I bought that one more coin because I was hoping that I was going to recoup what I thought were losses, so I went and I guess I believed that I was getting an auction piece."

Finally, as to Dupurton himself, the evidence adduced by the Government at trial established that he fraudulently conducted business through his four corporate entities. It is well settled that corporate liability forces the company to share the responsibility for the acts of its subordinates. *See U.S. v. George F. Fish, Inc.*, 154 F.2d 798, 801 (2d Cir.1946), cert. de-

nied, 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639 (1946) ("[T]he Supreme Court has long ago determined that a corporation may be held criminally liable for the acts of an agent acting within the scope of his employment ... [T]o deny the possibility of corporate responsibility for the acts of minor employees is to immunize the offender who really benefits, and open wide the door for evasion"). The record is replete with direct and circumstantial evidence that Dupurton was culpably involved with regard to his training of salespeople, his cleaning and grading of coins and his supervisory role in the overall operation.

### CONCLUSION

The Court concludes that a reasonable jury could find the guilt of all the defendants as to all the convicted counts, beyond a reasonable doubt. After considering the Numisgroup Defendants' submissions and hearing oral argument, and for the reasons outlined above, it is hereby ORDERED, that this motion for a judgment of acquittal pursuant to Fed. R.Crim.P. 29(c) by the Numisgroup Defendants is DENIED in all respects. The Numisgroup Defendants will be sentenced on January 11, 2002 at 1:30p.m. **SO ORDERED.**